IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANTHONY SWAIN, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:15-CV-1861-N-BK |
| | § | |
| CAROLYN COLVIN, Acting | § | |
| Commissioner of Social Security, | § | |
| | § | |
| **Defendant.** | § | |

FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

This case has been referred to the magistrate judge for pretrial management.  The Court

now considers the parties' cross-motions for summary judgment, Doc. 16; Doc. 19.  For the

reasons that follow, it is recommended that Plaintiff's *Motion for Summary Judgment* be

**GRANTED**, Defendant's *Motion for Summary Judgment* be **DENIED**, the Commissioner's

decision be **REVERSED**, and the case be **REMANDED** for the calculation and award of

benefits.

I.  BACKGROUND[1]

A.      Procedural History

Plaintiff seeks judicial review of a final decision by the Commissioner denying his claim

for Supplemental Security Income ("SSI") under the Social Security Act ("the Act").  In

February 2008, Plaintiff filed for SSI, claiming that he had been disabled since December 2007.[1]

---

[1] The following background comes from the transcript of the administrative proceedings, which
is located at Docs. 11-13.

[1] The earliest month for which the Social Security Administration may make SSI payments is the
month following the month in which the claimant filed his application.  20 C.F.R. § 416.335.

Tr. at 189, 313.  His application was denied at all administrative levels, and he now appeals to this Court pursuant to 42 U.S.C. § 405(g).  Doc. 11-3 at 2; Doc. 11-3 at 44; Doc. 11-5 at 6-18; Doc. 11-6 at 4; Doc. 12-2 at 2-3.

**B.**      **Factual Background**

Plaintiff was born on August 13, 1971, and he was 36 years old when he filed for SSI benefits, making him "a younger individual" under the Act.  Doc. 11-3 at 57.  Plaintiff had no past relevant work and had only completed the tenth grade, but eventually obtained his GED in 1998.  Doc. 11-3 at 56; Doc. 11-9 at 14; Doc. 12-9 at 119.  His lumbar problems began in the early '90s when he injured his back while working.  Doc. 12-1 at 15; Doc. 12-1 at 71.  Over the next several years, he sought medical assistance for his pain, including surgery, physical therapy, medication, imaging studies, emergency treatment, injection therapy, a TENS unit, and use of a wheelchair and a cane, none of which provided significant positive results.  Doc. 12-1 at 2-4; Doc. 12-1 at 7; Doc. 12-1 at 13-16, 18-21, Doc. 12-1 at 26-27; Doc. 12-1 at 41; Doc. 12-1 at 53-54, 56-58, 61; Doc. 12-1 at 70, Doc. 12-3 at 10; Doc. 13 at 25-26; Doc. 13 at 37, Doc. 13-1 at 3-15; Doc. 13-2 at 4, 7.  Rather, he continued to (1) feel sharp burning pain in his back, which was aggravated by movement, Doc. 13-1 at 7, 9, 11; (2) experience radiating pain from his lower back into his leg, Doc. 13-1 at 7, 10, 12; Doc. 13-4 at 73; Doc. 13-5 at 18; (3) feel shooting pain, Doc. 13-5 at 17-19; and (4) have positive straight leg raise tests, including on the right and left side, both sitting up and lying down, Doc. 13-1 at 4; Doc. 13-1 at 11; Doc. 13-1 at 23; Doc. 13-5 at 18-19.

In February 2008, Dr. Frank Kromelis, M.D., a consultative physician, evaluated Plaintiff.  Doc. 11-3 at 55; Doc. 12-1 at 126-28.  He found that Plaintiff had no significant

Thus, the relevant period in this case began in February 2008, when Plaintiff protectively filed his application.  Doc. 11-8 at 2-4.

neurologic abnormalities but did have some lordosis (convex curvature)[2] of the lumbar spine, although he did not experience any numbness, tingling, or weakness in his legs.  Doc. 12-1 at 126-27.  Moreover, he noted that Plaintiff had no muscle atrophy, edema, joint deformity, or limitation of motion in his peripheral joints and that, in fact, Plaintiff was "quite muscular." Doc. 12-1 at 126.  Dr. Kromelis stated that Plaintiff's sensory function was intact and that he would only flex his back in the anterior position to 20 degrees, citing pain.  Doc. 12-1 at 126.  X-rays of Plaintiff's lumbosacral spine revealed that (1) the vertebral bodies were intact and in proper alignment; (2) disc heights were well-maintained; (3) there were normal facet articulations; (4) Plaintiff had intact sacroiliac joints and upper sacral neural foramina; and (5) there was reversal of the normal lordosis that could be related to muscle spasm.  Doc. 12-1 at 126-27.  Dr. Kromelis concluded that at that time there was no evidence that Plaintiff had persistent radicular deficits.  Doc. 12-1 at 126.

In November 2008, Plaintiff reported that he could not get his prescription pain medication filled because he did not have insurance and was homeless.  Doc. 12-6 at 24.  In January 2009, it was noted that Plaintiff was repeatedly complaining about not being able to obtain SSI benefits and needed a doctor's note to state that he is disabled.  Doc. 12-7 at 23.  In March 2009, Plaintiff reported that he was having serious back pain, but he could not get anyone to help him and he could not get any medications because he could not "get on any med. programs."  Doc. 12-6 at 20.

In September of 2009, Dr. William Dodge, M.D., noted that Plaintiff had a decreased range of motion in his lumbar spine and myofascial trigger point tenderness.  Doc. 13-1 at 3.  He

---

[2] All medical terms are defined by reference to *Stedman's Medical Dictionary* (updated Nov. 2014) unless otherwise noted.

had a positive straight leg raise test, an abnormal gait, and he was walking with a cane. Doc. 13-1 at 3.  Additionally, Plaintiff exhibited weakness in his right quadricep and some loss of dorsal flexion in the big toe and had sensory loss in the right S1 dermatome (an area of skin supplied by nerves from a single spinal root). Doc. 13-1 at 3, 10.  Dr. Dodge's diagnosis was lumbar disc displacement and lumbar radiculitis (inflammation). Doc. 13-1 at 4.  Plaintiff continued to see Dr. Dodge on multiple occasions through December of 2010, however Plaintiff's physical exams and level of pain did not change and, consequently, Plaintiff was referred to Dr. Marvin Van Hal, an orthopedic specialist. Doc. 13-1 at 6, 9-12, 15.

Dr. Van Hal noted that Plaintiff's radiating leg pain had gradually increased since a previous spinal surgery in 2002. Doc. 12-9 at 142.  Plaintiff had been prescribed three hydrocodone tablets each day for pain. Doc. 12-9 at 142.  Upon examination, Plaintiff revealed decreased sensation into the right leg, a decrease in spinal range of motion, and an inability to effectively heel toe walk on his right side. Doc. 12-9 at 142-43.  Dr. Van Hal's diagnosis was lumbar radicular syndrome, with the right greater than the left lower extremity, and post laminectomy syndrome (following excision of a vertebral lamina)[3]. Doc. 12-9 at 143.

Plaintiff underwent an MRI in November of 2010 that revealed (1) a moderately large disk rupture on the right side of L1-L2 that displaced the right L1 root and contacted the foraminal[4] portion of the root as well, with a moderate loss of disc height, mild desiccation, and a mild central disc bulge; (2) at L2-L3, anterior and posterior osteophytes (bony outgrowths or protuberances) and disk bulges, with disc desiccation, a moderate loss of disc height, endplate degenerative changes, and moderate inferior neural foraminal narrowing bilaterally; (3) at L3-

---

[3] Lamina is a part of the vertebra at the back portion of the vertebral arch that forms the roof of the canal through which the spinal cord and nerve roots pass. http://www.niams.nih.gov/health_info/spinal_stenosis/  (last visited June 3, 2016).
[4] the dorsal side of the vertebral bodies where the spinal cord is located.

L4, a grade 1 retrolisthesis[5] with accompanied moderate bilateral facet effusions[6], a large

posterior disc rupture and osteophytes causing a mild stenosis of the central spinal canal resulting

in mass effect[7] of the left and right L4 nerve roots within the spinal canal, and moderate inferior

neural foraminal narrowing bilaterally; (4) at L4-L5, a ruptured disc more prominent on the left,

disc desiccation, loss of disc height, moderately severe bilateral neural foraminal narrowing,

slight displacement of the left L-5 nerve root within the spinal canal, which contacted the

transiting right nerve root, and contact with the left nerve root; and (5) at L5-S1, a diffuse

posterior ruptured disc with accompanied disc desiccation, loss of disc height, endplate

degeneration, and osteophytes causing narrowing of the thecal sac[8] and contact and displacement

of the transiting left S1 nerve root within the spinal canal, which slightly contacted the transiting

right S1 root.  Doc. 12-9 at 145.  Finally, the MRI indicated a "bone island" at S1, which is a

benign tumor of mature cartilage that should not be growing at that location.  Doc. 12-9 at 145-

46.

In December 2010, Dr. Van Hal noted that the MRI showed that Plaintiff did not have

any normal lumbar disc levels, and he would have difficulty with fusion surgery as he did not

have any normal disc levels that could be built next to.  Thus, injection therapy was the only

option, and Plaintiff agreed to that treatment.  Doc. 13-1 at 23.  Plaintiff received no benefits

from the first injection, as his pain actually increased for three to four days subsequent to the

---

A posterior vertebral shift.  http://www.ncbi.nlm.nih.gov/pubmed/10675942 (last visited June 3, 2016).

[6] the escape of fluid into the facet joints, which are located in the posterior aspect of the vertebral column.

[7] Compression.  http://neurosurgery.ucla.edu/brain-aneurysm (last visited June 3, 2016).

[8] The thecal sac is a fluid filled sac that the spinal cord floats within.  *Burkhardt v. Com'r of Soc. Sec. Admin.*, No. 08-CV-2032-B, 2009 WL 3849617, at *2 n.4. (N.D. Tex. 2009) (Ramirez, J.) (quotation omitted).

procedure.  Doc. 13-5 at 20.  Plaintiff received a second injection in September 2011, which gave him some relief, with his pain dropping from severe to moderate.  Doc. 13-5 at 7-9, 16.

In January and February of 2011, Dr. Sofia Weigel, M.D conducted an EMG/nerve conduction study on Plaintiff.  Doc. 13-4 at 70, 73.  Dr. Weigel noted that Plaintiff's muscles had normal bulk and tone and he was able to walk without an assistive device, but had diminished reflexes in his bilateral Achilles tendons.  Doc. 13-4 at 71, 74.  EMG testing was "extensively positive" throughout the lumbar paraspinal region and Dr. Weigel was unable to identify one focal nerve root level as the issue.  Doc. 13-4 at 72.  It was recommended that correlation of Plaintiff's physical symptoms be accomplished with imaging and evaluation for significant multi-level degenerative disc disease or multi-level radiculopathy.  Doc. 13-4 at 72, 75.

In June 2011, Plaintiff underwent a lumbar myelogram and post myelogram CT of his lumbar spine.  Doc. 13-5 at 13.  The results included (1) disc fusion at L1-L2; (2) degenerative disc disease at L2-L3 and encroachment on the thecal sac; (3) slight retrolisthesis at L3-L4 with a large disc bulge; (4) a disc rupture at L4-L5, greater on the left; (5) at L5-S1, a broad-based disc rupture and slight retrolisthesis and foraminal narrowing. Doc. 13-5 at 13-14.

C.     **ALJ's Decision**

In May 2011, the ALJ issued a decision, first determining that Plaintiff had not performed substantial gainful activity since his protected filing date.  Doc. 11-3 at 4.  Next, the ALJ determined that Plaintiff suffered from the severe impairments of "degenerative disc disease, schizoaffective disorder, a history of drug abuse, and a seizure disorder."  Doc. 11-3 at 4. Additionally, the ALJ found that Plaintiff's impairments, taken individually or in combination, did not meet or medically equal the criteria for any of the Listed impairments.  Doc. 11-3 at 50; 20 C.F.R. § 404, subpt. P, App. 1.

As relevant here, the ALJ found that based on Plaintiff's residual functional capacity ("RFC"), he: (1) could lift/carry ten pounds; (2) could stand/walk two hours in an eight-hour workday; (3) could sit six hours in an eight-hour workday; (4) would need to stand and stretch or change position at his workstation for two minutes every 30 minutes; (5) could only occasionally climb ramps/stairs and he could not climb ladders/ropes/scaffolds; (6) could only occasionally stoop/kneel; and (7) could not reach, balance, or crawl. Doc. 11-3 at 51.

Based on the vocational expert's testimony, the ALJ found that an individual of the same age, education, RFC, and work history as Plaintiff could perform the occupations of microfilm document preparer, semi-conductor bonder, and fabrication table worker, all of which existed in sufficient numbers in both the state of Texas and the United States. Doc. 11-3 at 58. The ALJ thus concluded that Plaintiff had not been under a disability, as defined in the Act, from his February 2008 protected filing date through the date of the decision. Doc. 11-3 at 58. The Appeals Council upheld the ALJ's decision on April 3, 2015. Doc. 11-3 at 2-5.

## II. APPLICABLE LAW

An individual is disabled under the Act if, *inter alia*, he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner uses the following sequential five-step inquiry to determine whether a claimant is disabled: (1) an individual who is working and engaging in substantial gainful activity is not disabled; (2) an individual who does not have a "severe impairment" is not disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors; (4) if an individual is capable of performing his past work, a finding of "not disabled" must be made; (5)

if an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if any other work can be performed.  *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b-(f)).

Under the first four steps of the analysis, the burden of proof lies with the claimant. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  If the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan*, 38 F.3d at 236; 42 U.S.C. §§ 405(g), 1383(C)(3).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett*, 67 F.3d at 564.  Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.

### III.  ARGUMENT

Plaintiff argues that the ALJ erred in finding that his severe "degenerative disc disease" did not satisfy "Listing1.04, disorders of the back" based on the ALJ's incorrect belief that there was no evidence that Plaintiff had experienced the necessary degree of physical pain and functional limitations.  Doc. 16 at 18.  Plaintiff asserts that the ALJ identified Listing 1.04, but did not discuss the evidence considered in determining which Listing or Listings apply and explain how she concluded that Plaintiff did or did not meet the criteria.  Doc. 16 at 18-19 (citing *Aulder v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)).  Plaintiff contends that the ALJ improperly analyzed Listing 1.04 and maintains that his back impairment meets the listing.  Doc. 16 at 18-21.

Defendant responds that the ALJ properly determined at step three of the sequential analysis that Plaintiff did not meet the criteria of Listing 1.04A because he failed to show evidence of positive straight leg raising tests in both the sitting and supine positions.  Doc. 19 at 4.  Defendant maintains that the ALJ explicitly identified the listings that she considered, including Listing 1.04, and discussed the medical evidence, particularly Dr. Kromelis's findings, that supported her decision.  Doc. 19 at 5.

In reply, Plaintiff asserts that, under *Aulder*, the ALJ was required to discuss the evidence offered in support of the claim for disability and to explain why she found the claimant not to be disabled at that step.  Doc. 20 at 3-4.  Plaintiff concludes that the evidence allows for a remand of the decision for the direct payment of benefits or, at a minimum, remand for another hearing.  Doc. 20 at 7.

## IV. ANALYSIS

A claimant may satisfy his burden of proving disability if he shows that his impairment

or impairments meet or equal a listed impairment.  20 C.F.R. § 404.1520(a)(4)(iii), (d).  To

"meet" a Listing, a disorder must satisfy all of the criteria of the particular Listing, including any

relevant criteria in the introduction.  20 C.F.R. § 404.1525(c)(3).  If an ALJ does not identify the

listed impairment for which a claimant's symptoms failed to qualify or provide any explanation

as to how the ALJ reached the conclusion that the claimant's symptoms were insufficiently

severe to meet any listed impairment, "[s]uch a bare conclusion is beyond meaningful judicial

review."  *Audler*, 501 F.3d at 448.  Nevertheless, although an ALJ has a duty to analyze

Plaintiff's impairments under every applicable Listing, an ALJ's failure to consider a specific

Listing is harmless if the record shows the Listing was not met.  *Id.* at 448-49.

Listing 1.04A, which covers disorders of the spine, requires that a claimant's disorder

result in compromise of a nerve root or the spinal cord with evidence of nerve root compression,

characterized by (1) neuroanatomic distribution of pain; (2) limitation of motion in the spine; (3)

motor loss (such as atrophy with associated muscle weakness or muscle weakness) accompanied

by sensory or reflex loss; and (4) if there is involvement of the lower back, a positive straight leg

raising test (sitting and supine).  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04A.

As an initial matter, Plaintiff's medical records indicate that his disorder results in

"compromise of a nerve root or the spinal cord with evidence of nerve root compression" insofar

as his 2010 MRI indicated that (1) there were multiple levels of pressure on his lumbar nerve

roots, including a moderately large rupture on the right side of L1-L2 that "displaced the right L1

root ganglion and possibly contacted the foraminal portion of the root"; (2) stenosis of the central

spinal canal resulting in compression of the left and right L4 nerve root within the spinal canal;

10

and (3) a large ruptured disc at L4-L5, ultimately resulting in displacement of the left L-5 nerve root, contact with the transiting right root, and contact with the left nerve root. Doc. 12-9 at 145.

Next, the evidence of record demonstrates that Plaintiff has had multiple instances of neuroanatomic distribution of pain, i.e., radiating pain caused by nerve compression. *Chaplin v. Colvin*, No. 14-CV-935-Y-BL, 2016 WL 1715439, at 4 n.9 (N.D. Tex. 2016) (stating that neuroanatomic distribution of pain "entails pain radiating to the extremities[.]") (quotation omitted); Doc. 12-9 at 142-43; Doc. 13 at 71; Doc. 13 at 82; Doc. 13-1 at 7, 9, 11, 13; Doc. 13-5 at 17. Limitation of range of motion in Plaintiff's spine is also clearly evident from the record, as is motor loss as evidenced by weakness in addition to decreased sensation and reflex loss. Doc. 12-9 at 142-143; Doc. 13-1 at 3; Doc. 13-1 at 7; Doc. 13-1 at 10-11; Doc. 13-5 at 20.

Finally, Plaintiff has had numerous positive straight leg raise tests, including at least two that were positive on both sides and in both the sitting and supine positions. Doc. 12-9 at 143; Doc. 13 at 71; Doc. 13-1 at 3; Doc. 13-1 at 23; Doc. 13-5 at 19. Because the Court finds that Plaintiff meets Listing 1.04A, the undersigned does not address Plaintiff's remaining arguments. The only remaining issue is whether to reverse and remand for further proceedings before the ALJ or enter an award of benefits as Plaintiff requests.

The fourth sentence of 42 U.S.C. § 405(g) provides that "[t]he [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "Put differently, after a party appeals the Commissioner's denial of benefits, the district court can, among other things, award benefits or remand the case back to the Commissioner for further proceedings." *Murkeldove v. Astrue*, 635 F.3d 784, 792 (5th Cir. 2011). The court may only order that additional evidence be taken "upon

a showing that there is new evidence which is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989) (quoting 42 U.S.C. § 405(g)). On the other hand, when an ALJ's decision is not supported by substantial evidence, and the uncontroverted evidence clearly establishes that the claimant is entitled to benefits, the case may be remanded with the instruction to make an award of benefits. *See Taylor v. Bowen*, 782 F.2d 1294, 1298-99 (5th Cir. 1986). In that instance, the record must enable the court to "determine definitively that the claimant is entitled to benefits." *Bailey v. Colvin*, No. 12-CV-1800-N, 2013 WL 5299285, at *8 (N.D. Tex. 2013) (Godbey, J.) (quoting *Armstrong v. Astrue*, No. 08-CV-045-C, 2009 WL 3029772, *10 (N.D. Tex. 2009)).

In the instant case, the Commissioner does not claim that there is new evidence that would support a finding that Plaintiff does not meet Listing 1.04A, and there is no information to suggest that such evidence exists. *Pierre*, 884 F.2d at 803. Moreover, as discussed above, the ALJ's decision that Plaintiff did not meet Listing 1.04A is not supported by substantial evidence. *Taylor*, 782 F.2d at 1299. In short, based on the record before the undersigned, the Court has determined that Plaintiff is definitively entitled to an award of benefits because he met Listing 1.04A during the relevant timeframe. *Bailey*, 2013 WL 5299285 at *8.

Finally, because this matter has been pending since 2008, having been opened, closed, remanded and otherwise delayed at various times at the administrative level, *see* Doc. 16 at 3-6, it is in the interest of both judicial economy and justice to award benefits without the necessity of a remand for a rehearing. *See Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) (remanding for an award of benefits where the case had been pending for over eight years, and the ALJ had relied on the wrong medical record in denying benefits); *Jimmerson v. Apfel*, 111 F.Supp.2d 846,

850-51 (E.D. Tex. 2000) (reversing and remanding for an award of benefits where the ALJ's decision was not supported by substantial evidence, the case had been remanded twice before, and the plaintiff's claim had been pending for eight years).  Accordingly, the Court should remand this case to the Commissioner for an award of benefits in Plaintiff's favor.  *See Helton v. Astrue* 2011 WL 1743409, *7 (N.D. Tex. 2011) (recommending reversal for an award of benefits where claimant established that he met a Listing).

## V.  CONCLUSION

For the foregoing reasons, it is recommended that Plaintiff's *Motion for Summary Judgment* be **GRANTED**, Defendant's *Motion for Summary Judgment* be **DENIED**, the Commissioner's decision be **REVERSED**, and the case be **REMANDED** for the calculation and award of benefits.

**SO RECOMMENDED** on June 17, 2016.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

       A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

14